# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **WILBURN RAY ADAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:03-1240** |
| | ) | **Judge Trauger** |
| **v.** | ) | **Magistrate Judge Knowles** |
| | ) | |
| **TRW AUTOMOTIVE U.S. LLC,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment of defendant TRW Automotive U.S. LLC ("TRW") (Docket No. 18), to which plaintiff Wilburn Ray Adams has responded (Docket No. 24), and TRW has replied (Docket No. 32).

## Factual Background and Procedural History

Wilburn Ray Adams was hired by TRW Automotive on August 28, 1972 (Docket No. 25, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ¶ 4) as a machine operator at TRW's commercial steering plant in Lebanon, Tennessee (Docket No. 1, Complaint ¶ 11). Throughout his employment at TRW, plaintiff worked as a machine operator, operating various pieces of machinery throughout the Lebanon plant. (Docket No. 25 ¶ 5.) Plaintiff asserts that he also performed other duties, such as operating a tow motor. *Id.* On November 20, 1995, plaintiff was assigned to the position of Cell Attendant in Department 1910 at the Lebanon plant—the Rack Piston Work Center—and held this position until his retirement in 2003. (Docket No. 25 ¶ 6; Docket No. 26, Appendix to Plaintiff's Response to Defendant's Motion for Summary Judgment, Tab 2, Exhibits to Deposition of Ray Adams.) As a production worker at

TRW, plaintiff was a member of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), Local Union No. 342. This union is the exclusive bargaining representative for all production and maintenance employees at the Lebanon plant. (Docket No. 25 ¶ 2.) The union and TRW are parties to a collective bargaining agreement ("CBA") that governs the terms and conditions of employment for these employees. *Id*.

Plaintiff testified that, as a Cell Attendant, he worked on the Rack Piston assembly line, on which several employees operated five or six machines to create rack pistons. (Docket No. 26, Tab 1, Excerpts to Deposition of Ray Adams at 56, 61.) A piston—a ten-inch long, cylindrical metal pole, weighing between twenty-two and twenty-four pounds—would make its way to plaintiff's work station at the end of the assembly line. *Id*. at 61–66. Plaintiff operated two Bourn & Koch machines to cut internal helixes into the pistons as they arrived at his station. (Docket No. 25 ¶ 7.) Plaintiff would first go to the conveyor belt by his work station and retrieve a piston, and place it into one of the Bourn & Koch machines. *Id*. ¶¶ 10, 12. When the machines were loaded with the pistons, they would run their cycle, which lasted around one to two minutes.[1] *Id*. ¶ 13. Following the cycle, it was plaintiff's job to unclamp the part, blow off any metal shavings with an air gun, perform a quality check on the part, transfer the part onto a conveyer, and repeat the process. *Id*. ¶ 14. Plaintiff explains, however, that as a practical matter he did not perform a quality check on every part. Due to his experience with the machines, and

---

[1] Defendant asserts that the cycle took approximately one minute, and plaintiff ran the machines consecutively:

> Q. Okay. But if I understand what you're telling me, a part comes down, he takes the part, he'll put it in one machine, push the cycle button. At that point another part would come down the machine, he would put it in the second machine, run the cycle, unload the first machine, put it on the conveyor belt, unload - - I mean, goes through that process - -
> A. Yes.
> Q. - - the tandem process of going between the two machines; is that accurate?
> A. Yes.

(Docket No. 21, Tab 13, Dover Dep. at 52.) However, plaintiff maintains that the cycles lasted about two minutes, and he ran the machines simultaneously. (Docket No. 35 ¶ 28.)

2

in keeping with the practices of other production employees, plaintiff could tell which parts were "good" without performing a quality check.  *Id*.

According to Kevin Dover, who was plaintiff's supervisor at TRW, plaintiff was expected to complete approximately 355 parts per eight-hour shift.  (Docket No. 26, Tab 5, Excerpts from Deposition of Kevin Dover at 51.)  Dover testified that each shift included a twenty-minute lunch break and two twelve-minute breaks.  *Id*.  Plaintiff's other duties as a Cell Attendant—aside from operating the Bourn & Koch machines—included housekeeping and tooling work around his station, and a small amount of paperwork.  (Docket No. 25 ¶¶ 17, 19.)

On August 9, 2001, plaintiff injured his left ankle while at work.  (Docket No. 25 ¶ 25.)  How plaintiff sustained this injury is disputed—plaintiff claims he twisted his ankle when a floor mat came apart, while defendant contends he slipped on an oily floor—but both parties agree that he suffered an injury.  *Id*. ¶ 26.  As a result of his injury, plaintiff was referred to Dr. Roy Terry, an orthopedic surgeon, for evaluation.  (Docket No. 25 ¶ 27.)  Dr. Terry performed outpatient surgery to repair a tendon in plaintiff's left ankle on September 26, 2001 and prescribed a brace for plaintiff to wear on his left foot.  (Docket No. 35, Affidavit of Ray Adams ¶¶ 10–11.)  Plaintiff was out of work until sometime around Christmas of 2001, and, when he returned to work, TRW provided him with a temporary sit-down job to accommodate his temporary work restrictions.  (Docket No. 1 ¶ 18; Docket No. 6, Answer ¶ 18; Docket No. 25 ¶ 30.)   Following a final visit to Dr. Terry on January 22, 2002, plaintiff returned to full duty work.  (Docket No. 25 ¶¶ 31–32.)

On January 29, 2002, plaintiff was given a warning for loafing on the job by Bill Lawrence, Business Unit Manager of plaintiff's department.  *Id*. ¶ 33.  Plaintiff received a second warning for loafing on March 1, 2002.  *Id*.  Plaintiff's union filed a grievance under the

CBA objecting to the warnings, and they were rescinded and removed from plaintiff's personnel file. *Id.* ¶¶ 34–35. Plaintiff declares that, prior to this time, he was subject to very little disciplinary action during his twenty-nine years of employment at TRW. (Docket No. 35 ¶ 19.)

Plaintiff declares that, shortly after his injury in 2001, he brought a chair to work with him. *Id.* ¶ 12. He claims that he used it for several days, at which point Marco Stanley, Safety and Security Coordinator at the plant, took the chair away from plaintiff's workstation, promising to return with a better one. *Id.* Throughout the following several months, plaintiff claims that he continued to request the use of a stool. (Docket No. 35 ¶ 24; Docket No. 25 ¶ 36.) Between March and July of 2002, plaintiff's counsel sent three letters to Lane Moore, TRW's workers' compensation attorney, requesting a stool. (Docket No. 35 ¶ 15; Docket No. 25 ¶ 42.) Craig Pacernick, TRW's in-house counsel, responded to the letters on July 29, 2002 and stated that a stool would not be provided to plaintiff. *Id.*

On March 5, 2002, plaintiff was evaluated by Dr. William Blake Garside, another orthopedic surgeon, because he was unhappy with the results of the first surgery. (Docket No. 25 ¶ 45.) Dr. Garside diagnosed plaintiff with bilateral pes planus and left posterior tibial tendon insufficiency—meaning he had ruptured the tendon which maintained his arch and developed a flat-foot deformity. *Id.* ¶¶ 45–46. Plaintiff continued to see Dr. Garside throughout 2002. (Docket No. 26, Tab 8, Exhibits to Deposition of Dr. William Garside.) On October 22, 2002, Dr. Garside performed a triple arthrodesis procedure to fuse the joints in plaintiff's foot and correct the deformity. (Docket No. 25 ¶ 47.) Plaintiff was permitted to return to work on November 5, 2002, although Dr. Garside restricted plaintiff to light duty work with temporary restrictions at that time. *Id.* ¶ 49. It is undisputed that TRW assigned plaintiff to modified duty work, and, when light duty work was not available, plaintiff was placed on leave and paid

temporary total disability benefits pursuant to the Tennessee Workers' Compensation Law. *Id.* ¶ 50. Dr. Garside lifted some of plaintiff's temporary restrictions on January 21, 2003, and plaintiff was able to return to his Cell Attendant position at that time. *Id.* ¶ 51.

At some point following plaintiff's return to work in 2002, he was given a handicap placard so that he could park in spots closest to the TRW plant entrance. (Docket No. 25 ¶ 52.) It is unclear whether plaintiff requested this placard from TRW. Plaintiff did request to be allowed to rest in a supervisor's office as needed. He was given permission to do so, but claims he felt pressured to return to work when he took a break. (Docket No. 35 ¶ 23.) Plaintiff also claims that he requested the use of a handicap restroom because the restroom closest to his workstation could only be accessed by climbing stairs. *Id.* ¶ 17. The defendant allowed plaintiff to use the restroom, but plaintiff claims it was often used by other employees to loaf and smoke cigarettes. *Id.*

Plaintiff continued to see Dr. Garside in 2003. On March 4, 2003, plaintiff went to Dr. Garside and reported that he was feeling 500% better. (Docket No. 25 ¶ 56.) On April 15, 2003, an x-ray showed that plaintiff's joint had fused, healing the deformity. *Id.* ¶ 57. Dr. Garside then ordered a functional capacity evaluation ("FCE"), a test designed to determine the need for possible work restrictions. *Id.* ¶ 58. Following the FCE, Dr. Garside placed plaintiff on permanent work restrictions as follows:

> I am going to place him on restrictions limiting him to medium/medium heavy jobs as based on the dictionary of occupational titles. I'm placing him on permanent restrictions which limit him to alternating standing and sitting with no standing greater than 20-30 minutes per hour and occasional squatting, kneeling or climbing. He is limited to a lifting limit of floor to waist of 75lb occasionally and 45lb frequently with a lifting limit overhead of 60lb occasionally and 36lb frequently.

(Docket No. 26, Tab 8, Garside Exhibits.)  Plaintiff's last visit to Dr. Garside was on June 17, 2003.  (Docket No. 25 ¶ 59.)  It is undisputed that Dr. Garside's opinion at that time was that plaintiff walked with a normal gait.  *Id*.  Plaintiff was released from care to follow-up as needed, but has not returned to Dr. Garside since that time.  *Id*. ¶ 60.

After Dr. Garside placed plaintiff on permanent restrictions, Larry Kroggel, TRW's Human Resources Manager, Carl Flatt, President of UAW Local 342, and James Crowder, Union Shift Committeeman, discussed plaintiff's restrictions.[2]  (Docket No. 25 ¶ 62.)  It is not clear how they became aware of plaintiff's new restrictions.  On June 23, 2003, Mr. Kroggel and Mr. Crowder met with plaintiff, informed him that he was being placed on unpaid medical leave of absence and, although plaintiff disputes this as hearsay, explained that there was no available job at TRW for which he was qualified that would meet his medical restrictions.  *Id*. ¶¶ 66, 68.  It is undisputed that, during that meeting, Mr. Kroggel informed plaintiff that TRW would pay for a re-evaluation of plaintiff's medical condition in six months and that plaintiff would retain his seniority rights while on leave.  *Id*. ¶ 69.  Mr. Kroggel claims that plaintiff was also informed that he would retain company-paid group health insurance benefits pursuant to the CBA, but plaintiff denies that he was so informed.  *Id*. ¶ 68.  The following day, June 24, 2003, plaintiff informed TRW that he had elected to retire effective July 1, 2003.  *Id*. ¶ 71.

Plaintiff claims that, during July 2003, he attempted to find alternative employment, but was unsuccessful.  (Docket No. 35 ¶ 35.)  Plaintiff completed a Disability Report Form SSA-3368 and, on July 20, 2003, he signed an Application for Disability Insurance Benefits.  (Docket No. 25 ¶ 72.)  The Social Security Administration ("SSA") found that plaintiff was disabled, effective June 18, 2003.  *Id*. ¶ 73.  Plaintiff is currently receiving Social Security benefits, as well as working part time.  (Docket No. 35 ¶ 39.)

---

[2] Plaintiff asserts that he was not involved in this process.  (Docket No. 25 ¶ 62.)

Plaintiff asserts that his life has been greatly affected by his impairment. He explains that prior to his injury he led an active lifestyle. He frequently worked overtime, was able to perform housework and yard work without restriction, enjoyed recreational activities including fishing and hunting, and enjoyed a normal social life. *Id*. ¶¶ 4–9. Since his accident, however, plaintiff claims that he is significantly restricted in his daily activities. *Id*. ¶ 40. He describes difficulty in performing household tasks and yard work, and asserts that he can no longer participate in recreational activities to the same extent that he did before. *Id*. ¶¶ 42–49. Plaintiff claims to be grouchy and irritable, resulting in a diminished social life. *Id*. ¶ 51. Finally, plaintiff asserts that he walks much slower than the average person, cannot stand for longer than thirty minutes, cannot perform household tasks for longer than ten to fifteen minutes due to his standing limitations, and has difficulty climbing stairs or climbing into the bathtub. *Id*. ¶¶ 42–45, 50.

On or about March 21, 2003, plaintiff filed charges of discrimination with the Tennessee Human Rights Commission ("THRC") and the Equal Employment Opportunity Commission ("EEOC") in which he alleged disability discrimination and retaliation under the Americans with Disabilities Act ("ADA") and the Tennessee Handicap Act. (Docket No. 35 ¶ 25; Docket No. 21, Appendix to Documents Cited in Defendant's Memorandum in Support of Its Motion for Summary Judgment, Tab 12, Exhibit 24 to Adams' Deposition, Charge of Discrimination.)

On December 23, 2003, plaintiff filed a Complaint with this court. (Docket No. 1.) Plaintiff asserts that TRW discriminated against him in violation of the ADA, 42 U.S.C. § 12101 *et seq.*, and the Tennessee Human Rights Act ("THRA"), T.C.A. § 4-21-301 *et seq.*, by failing to provide reasonable accommodations for his disabilities and terminating him in a discriminatory

manner. He also claims that TRW retaliated against him for requesting accommodation and filing a charge of discrimination with the EEOC, in violation of the ADA and the THRA.

## Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of

the dispute at trial." *Gaines v. Runyon*, 107 F.3d 1171, 1174–75 (6th Cir. 1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.* at 255.

The court should also consider whether the evidence presents "a significant disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue of material fact must render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).

## Analysis

### I. Discrimination Under The ADA

The ADA provides that covered entities, including private employers, shall not "discriminate against a qualified individual with a disability because of the disability of such

individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2005). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

By its terms, the ADA prohibits an employer from discharging an employee because of his or her disability. 42 U.S.C. § 12112(a). The ADA also defines discrimination to include, and therefore prohibits, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). Plaintiff contends that TRW discriminated against him based on his disability in violation of the ADA by (1) failing to accommodate his disability and (2) terminating him in a discriminatory manner. (Docket No. 1 ¶¶ 49–50, 56–57.)

To recover on his ADA claim, the plaintiff must prove that (1) he is an individual with a disability; (2) he is otherwise qualified to perform his job requirements, with or without reasonable accommodations; and (3) he was either denied a reasonable accommodation for his disability or was subject to an adverse employment decision, such as discharge, that was made

solely because of his disability.[3]  *See Walsh v. United Parcel Serv.*, 201 F.3d 718, 724 (6th Cir.

2000); *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997).

## A. Failure to Accommodate Under The ADA

### 1. Disabled

In order to make out his claim of failure to accommodate, plaintiff must first prove that

he is "disabled" under the ADA.  The ADA defines the "disability" of an individual as follows:

> (A) a physical or mental impairment that substantially limits one or more of the
> major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).  In his Complaint, plaintiff alleges both that he is disabled and that

the defendant regarded him as disabled.[4]  (Docket No. 1 ¶¶ 48, 55.)

#### *a. Physical or Mental Impairment*

In order for a plaintiff to show that he is actually disabled under 42 U.S.C. §

12102(2)(A), he must establish three things: (1) that he has a physical or mental impairment, and

(2) that such impairment substantially limits (3) one or more of his major life activities.  *Sutton*

*v. United Air Lines, Inc.*, 527 U.S. 471, 479 (1999).  In *Sutton*, the Supreme Court recognized

---

[3] The Sixth Circuit in *Monette* discusses the elements that must be established for a plaintiff to prevail on an ADA claim.  While many cases involve the *McDonnell Douglas* burden-shifting analysis, which allows a plaintiff to show discrimination through indirect evidence, this approach is not appropriate in cases where an employer has relied on the employee's impairment in its decision-making.  Where an employee is seeking accommodation from an employee, and is claiming that he would be qualified to perform the essential functions of the job with such reasonable accommodation, the disputed issues will be whether such accommodation is reasonable, whether such accommodation would impose an undue hardship on the employer, and whether the plaintiff is capable of performing the job with the suggested accommodation.  *Monette*, 90 F.3d at 1183.  These factors may be established through direct evidence, eliminating the need for a *McDonnell Douglas* burden-shifting analysis.  *Id.*, at 1182–83. The *McDonnell Douglas* analysis is improper in this case, where the employer, of necessity, considered plaintiff's impairments in determining whether to give him a stool, whether to place him on unpaid medical leave, etc.

[4] As discussed *infra*, the court concludes that the plaintiff has succeeded in raising a genuine issue of material fact as to whether he has a physical impairment that substantially limits a major life activity.  By contrast, plaintiff has failed to make any argument to defend against the defendant's assertion that he cannot establish that he was "regarded as disabled" by TRW (Docket No. 19 at 18), which is the basis of Count II of his Complaint. Accordingly, the plaintiff has failed to raise a genuine issue of material fact in support of this count, and it will be dismissed.

Case 3:03-cv-01240   Document 37   Filed 07/22/05   Page 11 of 40 PageID #: 11

that the EEOC regulations regarding the ADA may provide guidance in further defining the language of the statute.[5]

To qualify as disabled, " a claimant must initially prove that he or she has a physical or mental impairment." *Williams*, 534 U.S. at 194. A physical or mental impairment is defined as:

> (1) any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin and endocrine; or (2) any mental or physiological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (2005). The diagnosis of an impairment alone, however, is not enough to establish that a plaintiff is disabled under the ADA. *See Williams*, 534 U.S. at 198 ("It is insufficient for individuals attempting to prove disability statute under this test to merely submit evidence of a medical diagnosis of an impairment.").

Both parties agree that plaintiff was diagnosed on March 5, 2002 with bilateral pes planus and left posterior tibial tendon insufficiency. (Docket No. 25 ¶ 45.) The defendant accepts that plaintiff has an impairment and contends only that the impairment does not substantially limit one or more of plaintiff's major life activities. (Docket No. 19, Defendant's Memorandum in Support of Its Motion for Summary Judgment, at 14–15.) The court agrees with the parties that the plaintiff has carried his burden to show that he has a physical impairment.

### b. Substantially Limits

---

[5] The Court recognized that no agency has been charged with the responsibility of implementing the generally applicable provisions of the ADA. *Sutton*, 527 U.S. at 479. The EEOC has, nonetheless, issued regulations that include definitions of the term "disability." The Court found it appropriate to use these definitions because both parties in *Sutton* accepted the regulations as valid. *See also Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 194 (2002) (applying EEOC regulations in a case where both parties accepted them as reasonable). In this case, neither party objects to the definitions provided by the EEOC regulations. In fact, both parties cite to the regulations in their memoranda. (Docket No. 19 at 13, 24; Docket No. 24 at 10–12.) Therefore, the court will consider the definitions provided by the EEOC regulations in determining whether plaintiff is disabled.

Once a plaintiff establishes that he has an impairment, the court must then go on to examine whether the impairment substantially limits a major life activity. *See  Sutton*, 527 U.S. at 483 (quoting 29 C.F.R. app. § 1630.2(j)) ("The determination of whether an individual has a disability is not necessarily based on the named of diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").  Because the definition of disabled includes the term "with respect to an individual," an individualized inquiry as to whether a plaintiff is substantially limited in a major life activity must be made based on the facts of a particular case. *Cotter v. Ajilon Serv., Inc.*, 287 F.3d 593, 598 (6th Cir. 2002); *see also Cehrs v. Northeast Ohio Research Ctr.*, 155 F.3d 775, 782 (6th Cir. 1998).  This type of assessment is "particularly necessary when the impairment is one whose symptoms vary widely from person to person." *Williams*, 534 U.S. at 199; *see also Cotter*, 287 F.3d at 598.

Both statutory terms "substantially limits" and "major life activities" have been strictly construed.  "Substantially limits" means:

> (1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1); *see also Penny v. United Parcel Serv.*, 128 F.3d 408, 414 (6th Cir. 1997).  The Supreme Court defines "substantially" to mean "considerable" or "to a large degree." *Williams*, 534 U.S. at 196–98; *see also Mahon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002).  The Court in *Williams* determined that the word "substantial", as used in the ADA definition of "disabled," "clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." *Id.* (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999)); *see also Mahon*, 295 F.3d at 190–91 (following

*Williams* by finding that a moderate or intermittent impairment is not a substantial limitation).[6]

A narrow interpretation of the term "substantially limits" is consistent with the intent of Congress. *Sutton*, 527 U.S. at 484 ("findings enacted as part of the ADA require the conclusion that Congress did not intend to bring under the statute's protection all those whose uncorrected conditions amount to disabilities"). The EEOC regulations require that a court consider several factors in determining whether an impairment is substantially limiting: (1) the nature and severity of the impairment; (2) the duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j); *see also Williams*, 534 U.S. at 196; *Penny*, 128 F.3d at 414.

### c. Major Life Activities

The *Williams* Court also applied a strict interpretation to the term "major life activities." Interpreting the word "major" to mean "important," the Court explained that "major life activities" must refer to "those activities that are of central importance to daily life," and emphasized that these terms must be "interpreted strictly to create a demanding standard for qualifying as disabled." *Williams*, 534 U.S. at 197; *see also Mahon*, 295 F.3d at 590 (also restricting major life activities to those that are of central importance to daily life). Major life activities are defined as, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i), *quoted in Sutton*, 527 U.S. at 480. Relying on interpretive guidelines, the Sixth Circuit has explained that this list is not intended to be exhaustive, and other activities may be included. *Mahon*, 295 F.3d at 590; *Penny*, 128 F.3d at 414. "Other major life activities include, but are

---

[6] The Sixth Circuit recognized in *Mahon* that the *Williams* decision addressed only the major life activity of performing manual tasks, but concluded that *Williams* "makes clear that *any* impairment" that is moderate or intermittent will not satisfy the requirement of substantially limiting a major life activity. *Mahon*, 295 F.3d at 590–91 (emphasis added).

not limited to, sitting, standing, lifting, [and] reaching." *Penny*, 128 F.3d at 414 (quoting 29 C.F.R. app. § 1630).

Plaintiff claims that he is limited in the major life activities of (1) performing manual tasks (Docket No. 24, Plaintiff's Response to Defendant's Motion for Summary Judgment, at 14), (2) walking and standing (Docket No. 24 at 13–14), and (3) working (Docket No. 24 at 16).[7] The court will examine each of these in turn.

### *i. Performing Manual Tasks*

The *Williams* Court addressed the issue of whether the plaintiff was substantially limited in the major life activity of performing manual tasks. While the Court did not provide a specific definition of the term "manual tasks," it listed some items that fall squarely within that category: "household chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives, and should [be] part of the assessment of whether [a plaintiff is] substantially limited in performing manual tasks." *Williams*, 534 U.S. at 201. Plaintiff claims that he is now limited in activities such as yard work, housework, cooking, and climbing into the bath, which the court finds come within the category of manual tasks that are of central importance to daily life. (Docket No. 35 ¶¶ 42, 44–45.) However, the court must determine whether he is "substantially limited" in these activities.

---

[7] The court concludes that some of the other activities in which plaintiff claims to be limited do not qualify as major life activities. Climbing ladders, fixing a vehicle, fishing, hunting, and water skiing, *see* Docket No. 35 ¶¶ 43, 46–49, are not "activities that are of central importance to daily life," and should not be included in a category of activities that includes such essential tasks as walking, seeing and hearing. The Supreme Court in *Williams* similarly declined to extend the definition of major life activities to those that were specific to the plaintiff's job. The Court explained that "the manual tasks unique to any particular job are not necessarily important parts of most people's lives," stressing that major life activities are only those that are of central importance to daily life. *Williams*, 534 U.S. at 201. While certain activities described by plaintiff may be important to him individually, that is not the question before the court. Therefore, the court will examine only whether the plaintiff is limited in the major life activities of performing manual tasks, walking, and working.

It is apparent from the record that, prior to his injury, plaintiff was able to perform all of these activities with ease for extended periods of time.[8]  However, the court's inquiry is not whether the plaintiff is limited compared to his prior abilities, but whether he is "significantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity."  *Williams*, 534 U.S. at 195–96; *Sutton*, 527 U.S. at 480; *Penny*, 128 F.3d at 414.  As to household activities, plaintiff explains: "Outside, I can still perform some yard work, but I have to stop and sit down after 30 minutes or so. . . . I can vacuum for about 10-15 minutes and then need to take a break.  The same is true with sweeping and mopping.  I can cook and help wash clothes, but I am limited in my standing and walking." (Docket No. 35 ¶ 44.)  On his application for Social Security, plaintiff complained of pain in his foot, but answered in the affirmative to questions such as: "Do you prepare your own meals?" and "Do you do household and/or outdoor chores?"  (Docket No. 21, Tab 22, SSA Activities of Daily Living Questionnaire.)

While plaintiff claims to be limited in these activities, it seems that he would be able to perform them without limitation if he was not limited in his ability to walk and stand.  His restrictions are related to his ability to walk or stand for an extended time, not to performing the manual tasks themselves.  Plaintiff is otherwise able to perform the manual tasks that are of central importance to daily life.  Therefore, the court concludes that he has not raised a genuine

---

[8] The plaintiff attests to the following:

> "At home I was unrestricted both inside and outside.  Inside, I would help my wife cook, vacuum, sweep, mop, wash clothes, iron, and make beds. . . . I was unlimited in my ability to push the lawn mower.  I would weedeat and could complete my entire yard without stopping.  I was able to paint our house all day long.  I could climb ladders, including going up on the roof for repairs and to clean gutters. . . . I would perform other work outside as well.  I could dig holes to plant trees, shrubs and plants.  I could work outside all day without stopping."

(Docket No. 35 ¶¶ 5–6.)

issue of material fact as to whether he is substantially limited in the major life activity of performing manual tasks.

### ii. Walking

Plaintiff next claims that he is substantially limited in the major life activity of walking. (Docket No. 24 at 14.)  It is well-established that walking is a major life activity.  *See Sutton*, 527 U.S. at 480; *Penny*, 128 F.3d at 415; *Williamson v. Hartmann Luggage Co.*, 34 F. Supp. 2d 1056, 1061 (M.D. Tenn. 1998); 29 C.F.R. § 1630.2(i).  However, few courts have defined what it means to be substantially limited in the major life activity of walking.  *Penny*, 128 F.3d at 415. The Sixth Circuit has clarified what is *not* a substantial limitation in the major life activity of walking:  "moderate difficulty or pain experienced while walking does not rise to the level of a disability."  *Id.* at 415; *see also Williamson*, 34 F. Supp. 2d at 1061 (quoting *Penny*).

Defendant claims, based on Dr. Garside's assessment of plaintiff's ability to walk, that plaintiff cannot establish that he is substantially limited in the major life activity of walking.  Dr. Garside testified that he believed plaintiff could walk in moderation and walk frequently. (Docket No. 21, Tab 14, William Blake Garside, Jr., M.D. Deposition Excerpts, at 15.) However, Dr. Garside interpreted the term "significant limitation" to mean an individual who can walk less than a block.  *Id.*  This interpretation is not consistent with the definition of "substantially limits" which requires the court to consider a plaintiff's restrictions compared with an average member of the general population.  It may be possible for an individual who is able to walk "in moderation" or "frequently" to be substantially limited compared to the average member of the general population.  In addition, Dr. Garside's assessment of plaintiff's abilities is not dispositive of the issue; an individualized assessment must still be made as to plaintiff's limitations.

Plaintiff has provided evidence that he suffers from more than "moderate difficulty or pain." He explains that he suffers from pain on a daily basis. (Docket No. 35 ¶ 40.) He has difficulty climbing stairs or standing for more than thirty minutes and walks "much slower than a normal person." (Docket No. 35 ¶¶ 44, 50.) Additionally, plaintiff explains that he can only perform household tasks for a short period of time because he is "limited in [his] standing and walking." *Id*. Plaintiff's wife has also asserted that he is limited in walking and standing. (Docket No. 36, Affidavit of Peggy Adams, ¶¶ 12, 14, 17.) This is consistent with his permanent medical restrictions of "alternating standing and sitting with no standing greater than 20-30 minutes per hour." (Docket No. 26, Tab 8, Garside Exhibits.) Dr. Garside determined that plaintiff has a permanent partial impairment of 25% of the lower left extremity, which is equivalent to 10% of the whole person. *Id*.

As plaintiff's diagnosis and permanent restrictions alone do not create a genuine issue of material fact, the court must consider the nature, duration, and long term impact of his impairment to determine whether he is significantly restricted when compared to the average person in the general population. As described above, plaintiff asserts that the nature of his impairment is severe. He explains that his pain affects him on a daily basis, and that he is restricted in performing many tasks, due to his limitations in walking and standing. The duration of these limitations is indefinite, as plaintiff has been placed on permanent restrictions. Accordingly, the expected long-term impact of such an impairment could be significant. Overall, the evidence on this point is not so one-sided that one party must prevail as a matter of law; rather, there is a genuine dispute between the parties. The court concludes that plaintiff has raised a genuine issue of material fact as to whether he is substantially limited in the major life activity of walking.

18

### iii. Working

Plaintiff finally claims to be substantially limited in the major life activity of working. (Docket No. 24 at 16.) While working has been recognized as a major life activity, both the Supreme Court and the Sixth Circuit have treated it as "a residual activity, considered, as a last resort, *only* '[i]f an individual is not substantially limited with respect to *any other* major life activity.'" *Sutton*, 527 U.S. at 492 (emphasis in original) (quoting 29 C.F.R. app. § 1630); *see also Mahon*, 295 F.3d at 590 (following *Sutton* by explaining that the category of working will be considered by the court only when "a complainant cannot show she or he is substantially impaired in any other, more concrete major life activity"). Because the court finds that a reasonable person could determine that the plaintiff is substantially limited in the major life activity of walking, it need not reach the question of whether he is also substantially limited in the major life activity of working.

### 2. Otherwise Qualified With or Without Reasonable Accommodation

In order to show that the defendant failed to accommodate the plaintiff under the ADA, plaintiff must also provide evidence that, despite his disability, he was otherwise qualified for his job. To establish that he is a "qualified individual with a disability," the plaintiff must show "(1) that he 'satisfies the prerequisites for the position [he holds or desires], such as possessing the appropriate educational background, employment experience, [and] skills,' and (2) that he 'can perform the essential functions of the position held or desired, with or without reasonable accommodation.'" *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 256 (6th Cir. 2000) (quoting *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 676 (7th Cir. 1998)).

### a. *Otherwise Qualified*

The plaintiff has met his burden of showing that he satisfied the prerequisites of the Cell Attendant position—that he had the appropriate background, experience, and skills. He was hired by TRW in 1972 and worked in many machine operator positions at the Lebanon, Tennessee plant. He held the Cell Attendant position at the time of his retirement in 2003. (Docket No. 35 ¶ 23.) His discipline record contains no indication that he failed to perform the duties of his job at any time that he occupied the Cell Attendant position (Docket No. 21, Tab 4, Exhibit 9 to Adams' Deposition, Discipline Summary), and he continued to fulfill his job requirements until he retired in June of 2003 (Docket No. 35 ¶ 23). Plaintiff alleges that he would have been able to continue working for TRW if reasonable accommodations had been provided for him. (Docket No. 35 ¶¶ 17–18, 27, 31–32.) The court must decide whether he was otherwise qualified with a reasonable accommodation.

The defendant argues that plaintiff was not qualified to perform his job requirements at the time of his retirement, and that his claim is barred by judicial estoppel. (Docket No. 19 at 19–20.) TRW relies primarily on an inconsistency between plaintiff's application to the Social Security Administration for disability insurance benefits—in which he claimed he was unable to work—and his deposition testimony in which he claimed that he was otherwise qualified to perform the duties of his Cell Attendant position.[9]

The defendant attempts to invoke the doctrine of judicial estoppel to hold plaintiff to the position taken in his SSA application, therefore preventing him from establishing that he was otherwise qualified. The doctrine of judicial estoppel may be applied to "preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical

---

[9] Plaintiff's application for disability insurance benefits states in relevant part: "I became unable to work because of my disabling condition on June 18, 2003." (Docket No. 21, Tab 21, Application for Disability Benefits.) Plaintiff now asserts that he is a qualified individual with a disability, entitled to a reasonable accommodation under the ADA. (Docket No. 24 at 21–22.)

gamesmanship, achieving success on one position, then arguing the opposing to suit an exigency of the moment." *Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 380 (6th Cir. 1998) (quoting *Teledyne Indus., Inc. v. Nat'l Labor Relations Bd.*, 911 F.2d 1214, 1217 (6th Cir. 1990)). To argue a claim of judicial estoppel, a party must show that his opponent: (1) took a contrary position, (2) under oath in a prior proceeding, and (3) the prior position was accepted by the court. *Id*.

In *Griffith*, the Sixth Circuit discussed the use of judicial estoppel in this context. 135 F.3d at 380–82. The court found that a genuine issue of material fact existed regarding the plaintiff's claims that he was a qualified individual with a disability, despite statements on his Social Security application that he was unable to work. Agreeing with the District of Columbia Circuit that "the receipt of disability benefits does not preclude subsequent ADA relief," the court rejected the use of judicial estoppel to bar ADA claims. *Id*. at 381 (citing *Swanks v. Wash. Metro. Transit Auth.*, 116 F.3d 582 (D.C. Cir. 1997)). The court clarified that its previous decisions allow prior sworn statements to be considered by the parties as a material factor, but that they could not bar an ADA claim. *See Blanton v. Inco Alloys Int'l Inc.*, 123 F.3d 916, 917 (6th Cir. 1997) (clarifying in a supplemental opinion that the court's original opinion "should not be read to endorse judicial estoppel in this context").

The court in *Griffith*—reversing a grant of summary judgment for a defendant who invoked judicial estoppel—cited three reasons for its decision on this issue. First, the Court explained that it is not necessarily inconsistent for a plaintiff to state on an application for Social Security benefits that he is unable to work, because the SSA application "gives no consideration to that person's ability to work with reasonable accommodation." *Griffith*, 135 F.3d at 382. The same plaintiff could later contend that he is qualified to perform his job *with reasonable*

21

*accommodation*, without making a contradictory statement. *See also Cleveland v. Policy Mgmt. Sys.*, 526 U.S. 795, 803 (1999) (explaining that "an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) *without* it") (emphasis in original)). Second, the court points out that questions on an SSA application may be open to interpretation because they often allow for short answers or checking boxes without an opportunity for elaboration or clarification of individual circumstances. Finally, the court notes the equitable nature of judicial estoppel, stating that it "is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement." *Griffith*, 135 F.3d at 382 (quoting *Teledyne*, 911 F.2d at 1218). Simply noting that two statements appear to contradict one another would prevent the court from considering the substance of those statements, and applying judicial estoppel in such circumstances "would be inappropriate given that the truth-seeking function of the court would be supplanted by an agency administrative decision rendered without an evidentiary hearing." *Id.*

Despite the fact that a plaintiff's claim may not be barred by simply invoking judicial estoppel regarding seemingly contradictory statements, a plaintiff cannot simply ignore the inconsistency, and it will be treated as a material factor. *See Cleveland*, 526 U.S. at 806 (holding that "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation."); *Williams v. London Util. Comm'n*, 375 F.3d 424, 429 (6th Cir. 2004) (quoting *Cleveland*); *Griffith*, 135 F.3d at 381 (explaining that a contradiction may still be treated as material by the parties). "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by

contradicting his or her own previous statement . . . without explaining the contradiction or attempting to resolve the disparity." *Cleveland*, 526 U.S. at 806. The Court in *Cleveland* provided a standard for addressing an inconsistency:

> To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation.

*Id*. at 807.

The fact that plaintiff said on his SSA application that he was "unable to work" is not alone enough to preclude his current statements that he was "otherwise qualified" by application of judicial estoppel. Plaintiff has offered explanations for the apparent inconsistencies. In his affidavit, plaintiff explains that he said he was unable to work on his SSA application because TRW had told him he was unable to work. He asserts that he told the SSA that "according to TRW, I was disabled and could not perform any production job in the facility." (Docket No. 35 ¶ 35.) Additionally, plaintiff's initial disability report contains the following answer from the plaintiff regarding why he stopped working: "Plant manager sent me home and told me they did not have a job for me. Unpaid medical leave."[10] (Docket No. 21, Tab 20, Form SSA-3368-BK.) The court concludes that plaintiff's proffered reasons are sufficient to overcome the apparent contradiction at this stage. The court will not utilize judicial estoppel to restrict the plaintiff to the answer given in his SSA application.

### b. Reasonable Accommodation:

---

[10] Plaintiff offers additional evidence of his understanding that his answers should reflect what was expected of him at TRW. In response to the question, "In **this job**, how many total hours each day did you: Walk? Stand?" plaintiff responded "8+." (Docket No. 21, Tab 20, Form SSA 3368-BK) (emphasis in original). Plaintiff explains, "I based this answer on what TRW required me to do at my Cell Attendant job, not what would have been done to modify my position with a stool or chair." (Docket No. 35 ¶ 37.) The court finds this interpretation of the question reasonable and further support for the sufficiency of plaintiff's contention that he was otherwise qualified, although the defendant does not address this evidence.

The court must first determine whether plaintiff has shown that the requested accommodations were reasonable, and then consider whether TRW has demonstrated that such accommodations would have imposed an undue hardship. The plaintiff must present evidence that a requested accommodation is reasonable. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996) (explaining that "the disabled individual bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable.") (emphasis in original); *see also Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633–34 (6th Cir. 1998) (quoting *Monette*). To carry this burden, the employee must show that the accommodation is "reasonable in the sense both of efficacious and of proportional costs." *Monette*, 90 F.3d at 1183 (quoting *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995)). The employee must also establish that he is capable of performing the essential functions of the job with the proposed accommodation. *Id*. at 1183–84.

"Once a determination is made that a proposed accommodation is, in a sense, 'generally' reasonable, the defendant employer then bears the burden of showing that the accommodation imposes an undue hardship upon it, given the employer's situation." *Monette*, 90 F.3d at 1184; *see also Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 728 (6th Cir. 2000) (applying the *Monette* analysis); *Bukta v. J.C. Penney Co.*, 359 F. Supp. 2d 649, 667 (N.D. Ohio 2004) (same).[11]

Plaintiff alleges that the defendant failed to provide a reasonable accommodation by (1) failing to modify his work station—specifically by failing to provide a stool or chair as plaintiff

---

[11] Where the plaintiff challenges a job requirement as unessential and seeks that it be modified, rather than requesting a reasonable accommodation, the employer must instead show that the challenged requirement is necessary. The employer is only required to change the requirement if it is not an essential function of the job. *Bratten v. SSI Serv., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999); *Monette*, 90 F.3d at 1184.

24

requested, and by (2) failing to reassign plaintiff to another position.[12]  (Docket No. 1 ¶ 49;

Docket No. 24 at 16–19.)  The court will address each of these contentions in turn.

### *i. Plaintiff's Request for a Stool*

Plaintiff asserts that he was qualified to perform him job as a Cell Attendant with the

reasonable accommodation of having a chair or stool for intermittent sitting at his workstation.

(Docket No. 35 ¶ 27.)  He claims that the defendant failed to accommodate him by denying him

the use of a stool or chair at his work station, so that he could comply with his medical

restrictions by avoiding standing all day.  (Docket No. 1 ¶¶ 24–28.)  Modification of a work

station and provision of equipment may be required to provide a disabled individual with the

reasonable accommodation necessary to perform the essential functions of his or her job.  29

C.F.R. § 1630.2(o)(1)(ii), (2)(ii).  The court concludes that the plaintiff has provided enough

evidence to create a genuine issue of material fact as to whether the defendant failed to

reasonably accommodate him by providing a stool or chair at his work station.

As the *Monette* court observes, the plaintiff has the initial burden of requesting an

accommodation and showing that the accommodation is objectively reasonable.  90 F.3d at

1183.  There is no question that plaintiff requested the use of a stool or chair at his work station.

In fact, the defendant has provided the court with three letters written by plaintiff's attorney

requesting a stool.  (Docket No. 21, Tabs 8–10, Exhibits 19–21 to Adams' Deposition, Letters

from Martin Holmes to Lane Moore.)  It is also undisputed that the defendant denied plaintiff the

use of a stool in a responsive letter to plaintiff's attorney.  (Docket No. 21, Tab 11, Exhibit 22 to

Adams' Deposition, Letter from Craig Pacernick to Martin Holmes.)  To determine whether the

---

[12] In his complaint, plaintiff also asserts that the defendant "failed to make reasonable accommodations for the Plaintiff, including . . . enabling the Plaintiff to utilize restroom facilities."  (Docket No. 1 ¶ 49.)  With respect to plaintiff's use of a handicap restroom, plaintiff fails to defend against defendant's argument that such an accommodation was provided (Docket No. 19 at 23), and admits in his deposition that he was allowed to use the handicap restroom facilities (Docket No. 26, Tab 1, Adams Dep. at 165).  Therefore, the court concludes that he has abandoned this portion of his failure to accommodate claim.

plaintiff has met his burden, the court need only address whether the plaintiff has created a genuine issue of material fact regarding the objective reasonableness of a stool as an accommodation.

Plaintiff claims that a stool would have been both a reasonable and effective accommodation. (Docket No. 24 at 17.) He asserts that he would have been able to use a stool to sit while the Bourn & Koch machines at his work station were running, a time when he would otherwise have to stand and wait for the machines to stop. *Id.* at 3. In his affidavit, plaintiff explained that, in the Cell Attendant position, he would load two of these machines and then wait for them to complete their cycle. (Docket No. 35 ¶ 28.) While he is unsure of exactly how long the cycle takes, the plaintiff estimates that it is between one and two minutes.[13] (Docket No. 21, Tab 1, Plaintiff, Wilburn Ray Adams' Deposition Excerpts at 187; Docket No. 35 ¶ 28.) Based on his experience in the Cell Attendant position, plaintiff claims that he could have met his production goal for parts per shift if he was able to sit between cycles. (Docket No. 35 ¶ 30.) In addition, he explains that quality control checks and other "non-operational activities" required in that position could be performed while seated. *Id.* There were also approximately forty-four minutes of break time during each eight-hour shift during which plaintiff could have sat down. (Docket No. 26, Tab 5, Excerpts from Deposition of Kevin Dover, at 51.)

In addition to his own knowledge of the demands of the Cell Attendant position, plaintiff has provided the court with an affidavit of TRW employee Michael Evans, who is familiar with production machines and affirms plaintiff's statement that the machines run on cycles and that

---

[13] Defendant asserts that plaintiff improperly attempts to "create a triable issue of fact by contradicting his prior sworn testimony" with respect to the length of time it takes the cycle to run. (Docket No. 32 at 5.) However, the court perceives no real contradiction. Plaintiff's statements regarding the cycle time have only been given as estimates. In his deposition testimony, the following exchange occurred: "Q. Okay. It obviously had to take less than a minute to run the cycle? A. Something like that; yes." (Docket No. 26, Tab 1, Adams Dep. at 68.) In his affidavit, he estimated the machine cycle time as "about 2 minutes." (Docket No. 35 ¶ 28.) This evidence is not contradictory and is only inexact. In addition, the defendant does not present any contrary evidence regarding the actual cycle time of the Bourn & Koch machines. Therefore, the defendant's argument is inapposite.

plaintiff could have sat during the cycles.  (Docket No. 29, Affidavit of Michael Evans ¶ 11.)

This type of alternating between sitting and standing is consistent with the recommendations of

two doctors regarding how plaintiff could continue in his job by sitting at times.  (Docket No.

26, Tab 10, Letters from Dr. David Gaw and Dr. Janina Meissner-Frisk.) [14]

      The defendant does not argue that providing a stool would pose an undue hardship, but

instead challenges plaintiff's contention that a stool is a reasonable or effective accommodation

by arguing that he would not have been able to perform the essential functions of the Cell

Attendant position with a stool.  (Docket No. 19 at 23.)  Defendant asserts that, given the short

cycle and the required production numbers, it would be physically impossible for plaintiff to be

able to stand only twenty to thirty minutes per hour and perform his job.  *Id*. at 22.  The

defendant only offers vague deposition testimony to support its contention that continuous

standing is required for the job.  Kevin Dover, plaintiff's supervisor, testified that there should

not have been any time during plaintiff's shift when he had nothing to do.  (Docket No. 21, Tab

13, Kevin Dover Deposition Excerpts at 53.)  He additionally stated that none of plaintiff's job

functions could be performed from a seated position, although he admits that there would have

been room for a stool at plaintiff's work station.  (Docket No. 21, Tab 13, Dover Dep. at 58.)

Larry Kroggel refers to the inability to sit while on a production job as "knowledge . . .

commonly held throughout the manufacturing ranks," but admits that there were no studies or

tests performed to determine whether it would be feasible to allow the plaintiff the use of a stool.

(Docket No. 21, Tab 17, Larry Kroggel's Deposition Excerpts at 106–07.)  Neither Mr. Dover

---

[14] Dr. David Gaw wrote on April 2, 2002, "[t]he best approach would be for him to alternate periods of standing and
sitting on an as needed basis."  Dr. Janina Meissner-Frisk expressed a similar recommendation in an April 5, 2002
letter:  "It is my professional opinion that allowing him to sit at his work station would decrease his pain." (Docket
No. 26, Tab 10, Letters from Dr. David Gaw and Dr. Janina Meissner-Frisk.)  Such an accommodation also would
have been consistent with plaintiff's permanent work restrictions which require "alternating standing and sitting with
no standing greater than 20-30 minutes per hour."  (Docket No. 26, Tab 8, Exhibits to Deposition of Dr. William
Garside.)

nor Mr. Kroggel gives an estimate as to how long the Bourn & Koch machines cycle, how long it took plaintiff to load the machines, or as a practical matter how much down time employees had after finishing their required work. In addition, as the plaintiff points out, the Cell Attendant job description does not specifically mention standing all day. (Docket No. 24 at 17.)

In addition to claiming that plaintiff could not perform his duties with the accommodation of a stool, defendant also claims that "it is undisputed that placing a stool at Plaintiff's workstation would pose a trip hazard." (Docket No. 19 at 23.) While defendant claims that this conclusion is the result of a safety analysis, it is not clear that the analysis was the result of plaintiff's request for a stool or included an assessment of the alleged safety issues involved with the use of a stool.[15] This conclusion also ignores that fact that plaintiff has provided evidence regarding the safety of placing a stool at his station, therefore creating an issue of material fact. Plaintiff contends that there was space at his work station for a stool, where it would not interfere with the manufacturing process. (Docket No. 35 ¶ 31.) In addition to Mr. Evans, two other former employees, Bobby Stafford and Tommy Good, explained that, based on their knowledge of the TRW production facility, a stool could have safely been placed at the plaintiff's work station for his use. (Docket No. 29, Evans Aff. ¶ 9; Docket No. 30, Affidavit of Bobby Stafford ¶ 8; Docket No. 31, Affidavit of Tommy Good ¶ 10.) Plaintiff also claims that there were other chairs throughout the plant, including the production department,

---

[15] Marco Stanley, Safety and Security Coordinator at TRW, testified regarding the safety analysis as follows:
    Q. Before we talk further about the stool issue, going back to the safety analysis, was it done before or after Mr. Adams brought a stool to his workstation or requested a stool?
    A. Without looking at any records, I want to say it was before, but I'm not positive to that.
    Q. But just so we're clear on the record, you're [sic] safety analysis was separate and apart from any request that Mr. Adams made for a stool?
        MR. MOSCHEL: Objection to form.
    A. Yes. I mean, I had done that because of the piston flying over at another workstation on from Ray.
(Docket No. 21, Tab 16, Marco Stanley's Deposition Excerpts at 35.)

and that those chairs did not pose a safety risk. (Docket No. 35 ¶ 16.) This assertion has been

supported by other TRW employees.[16]

The court concludes that plaintiff has raised a genuine issue of material fact as to whether

a stool would have been a reasonable accommodation (and as to whether he would have been

able to perform the essential functions of the Cell Attendant job with such accommodation) and

that the defendant has failed to establish that such accommodation was objectively unreasonable.

Because the defendant offers no evidence or argument to suggest that the provision of a stool

would have been an undue hardship, and because it is undisputed that the defendant refused to

provide plaintiff with a stool, summary judgment on this claim is improper.

### ii. Reassignment

Plaintiff also alleges that TRW failed to accommodate him by not reassigning him to

another job position instead of placing him on medical leave. (Docket No. 1 ¶¶ 43–44, 49.) He

avers that there were positions available for which he was qualified, and that the defendant did

not fulfill its obligation to place him in one of these positions. (Docket No. 1 ¶¶ 43–44.)

However, the court concludes that the plaintiff has not offered sufficient evidence for a

reasonable person to find that TRW failed to accommodate him by refusing to place him in

another job position.

---

[16] Following are statements from other TRW employees regarding the safety and prior use of stools or chairs.
 "Throughout my employment at TRW, there have always been chairs and stools scattered everywhere throughout
the plant in various departments that employees use to sit on while they are working and when they are not working .
. . [a] stool or chair could have been placed in a location that was highly visible to other employees and would not
obstruct traffic in any way. . . [or] interfere with Mr. Adams' movement between the machines." (Docket No. 29,
Evans Aff. ¶¶ 5, 10.) "Based on my knowledge and experience in working and operating machinery at TRW, it
would not have posed a safety hazard to have a stool/chair . . . at the end of the two machines, or in the near vicinity,
that Mr. Adams could have sat down while the machine was cycling. Such a stool or chair would be visible to other
employees and Mr. Adams could have easily maneuvered around the stool or chair if necessary." (Docket No. 30,
Stafford Aff. ¶ 8.) "There [were] one or two stools in the Bourn and Koch department that Ray Adams worked in . .
. it would not have posed a safety hazard." (Docket No. 30, Good Aff. ¶¶ 7, 10.)

Case 3:03-cv-01240   Document 37   Filed 07/22/05   Page 29 of 40 PageID #: 29

Reassignment may be required as a reasonable accommodation when an employee can no longer perform the functions of his job.[17] *See Burns*, 222 F.3d at 257 ("[A]n employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the Company for which that employee is otherwise qualified."); *Cassidy*, 138 F.3d at 634 ("Generally, transfer or reassignment of an employee is only considered when accommodation within the individual's current position would pose an undue hardship."); *Monette*, 90 F.3d at 1187 (recognizing that employers may be required to transfer a disabled employee to another position). However, employers are only required to reassign a disabled employee to a vacant position. *Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 457 (6th Cir. 2004) (outlining an employer's obligation to reassign a disabled employee); *Burns*, 22 F.3d at 257 ("According to the regulations, an employer need only reassign a disabled employee to a vacant position."); *Cassidy*, 138 F.3d at 654 ("[A] reassignment will not require creating a new job, moving another employee, promoting the disabled employee, or violating another employee's rights under a collective bargaining agreement."); *Monette*, 90 F.3d at 1187 ("[E]mployers are not required to create new positions for disabled employees in order to reasonably accommodate the disabled individual.").

While it is clear that employers have such an obligation, the *Monette* analysis requires an employee to first identify available positions to the employer. *See Cassidy*, 138 F.3d at 633–34

---

[17] The ADA provides:
(9) Reasonable accommodation
The term "reasonable accommodation" may include - -
(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.
42 U.S.C. § 12111(9) (emphasis added); *see also* 29 C.F.R. § 1630.2(o)(2)(i)–(ii).

(citing *Monette*, 90 F.3d at 1173). Following the reasoning of the Seventh Circuit, the Sixth Circuit in *Burns* explained that courts almost always require an employee to propose alternate jobs for which he or she is otherwise qualified. "Indeed, nearly all the cases that address a plaintiff's ability to recover as a 'qualified individual with a disability' in light of his or her employer's affirmative duty to accommodate conclude that, although employers have a duty to locate suitable positions for disabled employees, such employees may not recover unless they propose, or apply for, particular alternative positions for which they are qualified." *Burns*, 222 F.3d at 258.

Plaintiff has shown that there were vacant positions available at the time of his retirement. (Docket No. 21, Tab 17, Kroggel Dep. at 152.) However, he has not provided the court with sufficient evidence that he (1) was qualified to perform the vacant positions, or (2) had proposed transfer to a vacant position to his employer. The record shows that there were eight or ten positions available at the Lebanon plant when the plaintiff was placed on medical leave. (Docket No. 21, Tab 17, Kroggel Dep. at 152.) However, the plaintiff has not identified what these positions were, or whether he was capable of performing the required duties of those jobs other than his conclusory statement that "there were positions I could do." (Docket No. 21, Tab 1, Adams Dep. at 119.)

More significantly, however, plaintiff did not satisfy his obligation within the *Monette* scheme of proposing transfer to an alternative position to his employer. The only specific position that the plaintiff claims he requested is the tow motor job vacated by Walter Reels upon Reels' retirement. Plaintiff insists that he "pre-bid" on the tow motor job, which would have required TRW to consider him for the job when it became vacant. (Docket No. 21, Tab 1, Adams Dep. at 122.) However, plaintiff has provided no evidence of a pre-bid, other than his

31

own statement that it occurred. He does not specify the date on which he submitted the pre-bid, or point to any documentation verifying the event. Additionally, TRW claims it had no knowledge of a pre-bid from the plaintiff for the tow motor job or any other position.[18] TRW had no obligation to consider the plaintiff for this position, because he did not identify it as an available position for which he was qualified.

The plaintiff also claims that the tow motor position was given to someone with less seniority than him. Again he has failed to provide the court with any evidence supporting this proposition, other than a statement that "they put a man on that job that had just been hired." (Docket No. 21, Tab 1, Adams Dep. at 122.) The defendant has responded with evidence that Sam Hastings filled the position vacated by Mr. Reels, and that Mr. Hastings had more seniority than the plaintiff.[19] Even if TRW had been required to consider the plaintiff for the tow motor position, they would not be obligated to violate Mr. Hastings' rights under the Collective Bargaining Agreement to receive a position for which he had more seniority. *See Cassidy*, 138 F.3d at 654 (finding that an employer is under no obligation to violate another employee's rights under a collective bargaining agreement).

---

[18] Kroggel testified as follows:
> Q. And according to your earlier testimony, TRW claims that it had no pre-bids on file for Mr. Adams; is that correct?
> A. That's correct.

(Docket No. 21, Tab 17, Kroggel Dep. at 154.)

[19] Kroggel testified as follows:
> Q. I believe Mr. Adams testified that Mr. Reels had retired from the tow motor job. Do you recall who took his place?
> A. Yes.
> Q. Who took his place?
> A. Sam Hastings.
> Q. Did Mr. Hastings have more or less seniority than Mr. Adams?
> A. More.
> Q. So when Mr. Adams testified that TRW put someone in Mr. Reels' tow motor job that it just hired, that is incorrect?
> A. That's incorrect.

(Docket No. 21, Tab 17, Kroggel Dep. at 153–54.)

Finally, plaintiff does not provide any evidence that the tow motor position was even vacant at the time of his retirement. When asked in his deposition whether the position was available, plaintiff responded that he did not have any personal knowledge that it was.[20] In addition, Mr. Kroggel has testified that Mr. Reels did not retire until July 1, 2003, which followed Adams' announcement of his own retirement and was the day his retirement took effect. The combination of these circumstances leads the court to conclude that no reasonable person could find that TRW failed to reasonably accommodate the plaintiff by reassigning him to another position. The plaintiff's claim for failure to accommodate by reassignment will be dismissed.

## B. Wrongful Termination Under The ADA:

Plaintiff also claims that he was wrongfully terminated by TRW in violation of the ADA. To recover on this claim, he must show that (1) he is an individual with a disability, (2) he is otherwise qualified to perform his job requirements, with or without reasonable accommodations, and (3) he was discharged solely because of his disability. *See Walsh*, 201 F.3d at 724; *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996). Defendant asserts that this allegation is not contained in the Complaint. (Docket No. 32, Defendant's Reply Brief in Support of Its Motion for Summary Judgment, at 7.) The court disagrees and concludes that the Complaint may be fairly read to encompass a claim for wrongful termination when the plaintiff alleges: "The Plaintiff was terminated in a discriminatory manner when younger employees with fewer qualifications and less seniority, training and experience were retained." (Docket No. 1 ¶ 50.) However, because the plaintiff cannot establish that he was discharged, this claim must fail.

---

[20] The plaintiff testified as follows:
    Q. You don't have any personal knowledge that the job was vacant at [sic] the day you were placed on medical leave?
    A. I couldn't - - there's no way I could prove that; no.
(Docket No. 21, Tab 1, Adams Dep. at 123.)

Plaintiff contends in his memorandum that "it is undisputed that the sole reason for his discharge was his permanent restrictions and limitations, which form the basis of his disability" (Docket No. 24 at 23), but gives no citation for this statement. In fact, it is undisputed that Adams "elected to retire" on June 24, 2003, the day after he was placed on medical leave, not that he was affirmatively terminated by the defendant. (Docket No. 25 ¶ 71.) Nor does plaintiff argue that he was constructively discharged. Plaintiff admits that he would have retained his seniority rights while on medical leave, and TRW had planned to re-evaluate his employment situation in six months. *Id*. ¶ 69. For these reasons, the court concludes that plaintiff has failed to meet his burden with respect to a claim of wrongful termination under the ADA, and summary judgment will be granted on this issue.

## II. Discrimination Under The THRA

In Count III of his Complaint, plaintiff alleges that the conduct undertaken by TRW that he alleged in Counts I and II as violating the ADA also violates the THRA. (Docket No. 1 ¶¶ 61–62.) The court concludes that the plaintiff is thus alleging both failure to accommodate and wrongful termination on the basis of disability under the THRA.

As discussed supra, the court finds that plaintiff has not presented evidence that he was affirmatively terminated from his position as Cell Attendant. Therefore, any wrongful termination claim under the THRA must also fail.

Regarding plaintiff's failure to accommodate claim, the court first notes that plaintiff has only pled a violation of T.C.A. 4-21-101 *et seq.* and T.C.A. 4-21-301 *et seq.*, which are both sections of the THRA. "The employment-related part of the THRA does not expressly apply to claims of discrimination based upon a disability. Instead, an employee is protected from an

34

adverse employment decision based upon disability under the Tennessee Handicap Act ('THA') [Tenn. Code Ann. § 8-50-103]." *Perlberg v. Brencor Asset Mgmt.*, 63 S.W.3d 390, 394 (Tenn. Ct. App. 2001). However, claims made under the THRA for employment discrimination based on disability have been treated as equivalent to claims under the THA. The Court of Appeals of Tennessee has explained that the "THA works in conjunction with the THRA to grant an individual a civil cause of action for wrongful discrimination based upon a handicap." *Id.* The United States District Court for the Western District of Tennessee agreed that the two statutes work in conjunction with one another and found that a complaint alleging only a THRA violation had sufficiently stated a claim for wrongful discrimination based on handicap under the THA. *Dunn v. Sharp Mfg. Co. of America*, No. 01-2679 MA/V, 2003 WL 1793038, at *3 (W.D. Tenn. Jan. 10, 2003). A generous reading of plaintiff's complaint, therefore, permits the court to find that he has alleged disability discrimination under the THA.

Defendant alleges that plaintiff's THRA claim for failure to accommodate must be dismissed because there is no duty for employers to provide reasonable accommodation under applicable Tennessee state law. (Docket No. 19 at 18.) There is very little case law which suggests otherwise. In a case in which it considered a claim of wrongful termination on the basis of handicap under the THA, the Tennessee Supreme Court "look[ed] to federal law for guidance" in enforcing the THA. *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000). Thus, by reference to the ADA, it noted that a person, to be deemed qualified, must demonstrate that he can perform, *with or without reasonable accommodation*, the essential functions of the employment position in question. This was not a central question to the Court's analysis, however, because the defendant had conceded that the plaintiff was qualified for the position. Moreover, the plaintiff in *Barnes* did not request an accommodation or claim that he

35

needed one to perform the essential functions of his job. Thus, whether or not the THA imposes a duty to accommodate on employers was not squarely before (or decided by) the *Barnes* Court.

The United States District Court for the Western District of Tennessee created a similar parallel to the ADA when it stated that the THA "mirrors the ADA including the ADA's requirement of reasonable accommodation." *Bower v. Fed. Express Corp.*, 156 F. Supp. 2d 678, 689 (W.D. Tenn. 2001). This one-sentence pronouncement is the court's only commentary on the issue, however, and it includes no citation for such a proposition. Moreover, the court does not further consider the issue, holding that the THA was inapplicable on other grounds in that case. Thus, neither the *Barnes* nor the *Bower* Court was required to directly contemplate the issue of whether the THA imposes a duty on employers to provide reasonable accommodation.

By contrast the Court of Appeals of Tennessee has issued several unpublished decisions in which it squarely considered whether a reasonable accommodation claim is available under the THA, and concluded that it is not. The court has pointed out that, unlike the ADA, the THA does not require employers to provide disabled workers with reasonable accommodations. *Pruett v. Wal-Mart Stores, Inc.*, No. 02A01-9610-CH-00266, 1997 WL 729260, at *13 (Tenn. Ct. App. Nov. 25, 1997). The court has noted several times that the Tennessee Code is silent regarding any obligation to accommodate and has declined to impose one. *Anderson v. Ajax Turner Co.*, No. 01A01-9807-CH-00396, 1999 WL 976517, at *4 (Tenn. Ct. App. Oct. 28, 1999); *Pruett*, 1997 WL 729260 at *13; *Turner v. Eagle Distrib. Co.*, No. 03A01-9209-CH-00338, 1993 WL 88365, at *2 (Tenn. Ct. App. Mar. 29, 1993); *Abraham v. Cumberland-Swan, Inc.*, No. 01A01-92CH00032, 1992 WL 207775, at *8 (Tenn. Ct. App. Aug. 28, 1992) ("an employer incurs no liability for handicap discrimination when the employee's handicap prevents or impairs the performance of the assigned job duties associated with the employment").

The Sixth Circuit, although without citation, has made a similar contrast between the provisions of the Tennessee Code and the ADA.

> The federal and state statutes use different language, and the ADA utilizes several particular terms of art, including "essential functions" and "reasonable accommodation," which are properly before a jury deciding an ADA claim. In contrast to the THRA, an employer can still violate the ADA if the employee can perform the essential functions of her job *with* a reasonable accommodation.

*Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 466 (6th Cir. 1999) (emphasis in original). Finally, the Tennessee Attorney General has similarly interpreted the THA. Relying on the unpublished decisions of the Court of Appeals of Tennessee as evidence of the courts' reading of the law, the plain language of the statute, and the absence of interpretive rules, the Attorney General specifically answered the question, "Under current state law, may the Tennessee Human Rights Commission require employers to reasonably accommodate the needs of their disabled employees?" in the negative. Op. Tenn. Att'y Gen. No. 94-028, 1994 Tenn. AG LEXIS 24 (1994). The opinion concludes that it would be necessary to amend the statute to enable the THRC to require reasonable accommodation under state law (an amendment which has not been enacted since the Attorney General's opinion). The court concludes that this interpretation is the most appropriate reading of Tennessee state law from all of the available sources that have addressed the question of whether a claim for failure to accommodate exists. Finally, the plaintiff has failed to direct the court to any law that suggests otherwise, or even respond to defendant's argument that this claim is invalid. For these reasons, Count III of plaintiff's Complaint—which contains his claims of wrongful termination and failure to accommodate under Tennessee state law—will be dismissed, and defendant's Motion for Summary Judgment will be granted as to that count.

**III. Retaliation Under The ADA and THRA**

Plaintiff finally claims that TRW retaliated against him for requesting accommodation for his disability and for filing a charge of discrimination with the EEOC, and that such activity violated the ADA and the THRA.[21] (Docket No. 1 ¶¶ 62–68; Docket No. 24 at 23–24.) To establish a case of retaliation, an individual must show: (1) that he engaged in protected activity; (2) that this exercise of protected activity was known to the defendant; (3) that he thereafter suffered adverse employment action; and (4) that a causal connection existed between the protected activity and the adverse action." *Penny*, 128 F.3d at 417; *Canitia v. Yellow Freight Sys., Inc*, 903 F.2d 1064, 1066 (6th Cir. 1990). The analysis is similar under the THRA. *Miller v. City of Murfreesboro*, 122 S.W.3d 766, 775 (Tenn. Ct. App. 2003); *Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 96 (Tenn. Ct. App. 1996). The defendant does not dispute that plaintiff engaged in protected activity by requesting an accommodation and by filing a charge of discrimination. (Docket No. 19 at 25.) The court concludes, however, that plaintiff has not satisfied his burden of showing that he suffered an adverse employment action.

Plaintiff claims that defendant retaliated against him by issuing two written warnings for loafing, which plaintiff characterizes as a form of "overscrutinization." (Docket No. 24 at 24.) While it is undisputed that plaintiff received warnings on January 29, 2002 and March 1, 2002, there is no evidence that these events constitute adverse employment actions.[22] The Sixth Circuit has defined adverse employment action as one that causes a "'materially adverse' change in the terms or conditions of employment because of the employer's actions." *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999) (citing *Kocsis Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885

---

[21] Section 301 of the THRA states in relevant part: "It is discriminatory for a person . . . [to] retaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter." Tenn. Code Ann. § 4-21-301 (2005).

[22] Because plaintiff did not file his charge of discrimination with the EEOC until March 20, 2003, the court assumes that plaintiff is claiming that these written warnings were made in retaliation of his request for accommodation only.

(6th Cir. 1996) (citations omitted)).  Such change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" to qualify as adverse employment action. *Hollins v. Atl. Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999).  Plaintiff does not claim that the written warnings had any affect on the terms or conditions of his employment.  In fact, the warnings were rescinded and removed from plaintiff's personnel file, eliminating the possibility that they would affect his employment in the future.  (Docket No. 25 ¶ 35.)

Plaintiff also mentions that defendant's decision to place him on unpaid medical leave may constitute an adverse employment action for the purpose of establishing his retaliation claim.  (Docket No. 24 at 24.)  However, plaintiff cites no case law to support the proposition that unpaid medical leave may function as an adverse employment action.  In fact, the defendant points out (Docket No. 32 at 8), and the court agrees, that unpaid medical leave may be a form of reasonable accommodation under the ADA.[23]  29 C.F.R. app. § 1630.2(o); *see also Walsh*, 210 F.3d at 726; *Cehrs*, 155 F.3d at 783; *Hankins v. The Gap, Inc.*, 84 F.3d 797, 801 (6th Cir, 1996).  The court concludes, therefore, that plaintiff has not satisfied his burden of showing that unpaid medical leave constituted an adverse employment action.  For these reasons, the court finds that plaintiff has not created a genuine issue of material fact regarding his retaliation claim under either the ADA or the THRA.  Accordingly, these claims will be dismissed.

---

[23] In its reply brief, for the first time and in the context of an argument about why unpaid medical leave does not constitute an adverse action for purposes of plaintiff's retaliation claim, the defendant suggests in a one-sentence argument that it was actually complying with the reasonable accommodation provisions of the ADA by placing the plaintiff on unpaid medical leave.  (Docket No. 32 at 8.)  Having failed to make and support this argument with respect to plaintiff's failure to accommodate claim in its initial brief, the court will not consider the argument at this stage.

**Conclusion**

For the reasons stated herein, the defendant's Motion for Summary Judgment (Docket

No. 18) will be granted in part and denied in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge